Filed 8/29/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C094175 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 11F5466, 11F5586) |
| v. | |
| PRINCE KURTISS CHEATHAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Angus I. Saint-Evens, Judge. Reversed with directions.

Alexsis C. Beach & Rachel Lederman, Attorneys and Rachel Lederman for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Darren K. Indermill, Supervising Deputy Attorney General, and Paul E. O'Connor, Deputy Attorney General, for Plaintiff and Respondent.

Over a decade ago, Prince Kurtiss Cheatham fled criminal custody after he heard nonexistent voices that led him to believe his life was in danger. After being returned to custody, he again attempted to escape after once more hearing nonexistent voices because of his untreated schizoaffective disorder. He was charged based on these events and, after being found not guilty by reason of insanity, was committed to a state hospital. Since that time, Cheatham has taken medications that have largely subdued his mental health symptoms but have not resolved his symptoms entirely. He still hears nonexistent voices, though his medications and coping techniques have helped him ignore them.

Shortly before Cheatham's anticipated release from hospital custody, the local district attorney sought to extend his commitment under Penal Code section 1026.5.[1] Under this statute, a person found not guilty of a felony by reason of insanity may be committed to a state hospital for a period no longer than the maximum prison sentence for their offenses. But this commitment may be extended if, because of a mental disorder, the person both represents a substantial danger of physical harm to others and has serious difficulty controlling their potentially dangerous behavior. After two psychologists testified at trial that Cheatham met these criteria, a jury found the district attorney had proved the facts necessary to extend Cheatham's commitment.

On appeal, Cheatham raises two claims. He first contends the evidence at trial was insufficient to support the jury's findings. He further asserts that, should we reverse for this reason, the district attorney should be barred from trying the matter again under double jeopardy principles. Although he acknowledges these principles generally apply only in criminal matters, he contends they also apply in proceedings to extend a section 1026.5 commitment per subdivision (b)(7) of section 1026.5, which, among other things,

---

[1] Further undesignated statutory references are to the Penal Code.

states that a person in a proceeding to extend a commitment "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings."

We agree with Cheatham on both points. Although the evidence firmly establishes that Cheatham has a mental disorder, nothing signals he has serious difficulty controlling potentially dangerous behavior because of this disorder. As far as the record shows, Cheatham has never once engaged in behavior dangerous to others because of his mental disorder. Nor has he ever indicated that he *might* engage in this type of behavior. And although some individuals with Cheatham's mental disorder may have difficulty controlling their dangerous behavior because of their disorder, that alone is not grounds for concluding that Cheatham too would have such difficulty. Because of the lack of evidence supporting the required showing, we find the evidence insufficient to support a commitment extension under section 1026.5. We further find that, on remand, the district attorney cannot again attempt to extend Cheatham's commitment. For these reasons, we will reverse the trial court's order extending Cheatham's commitment and direct the court to dismiss the petition to extend the commitment.

## BACKGROUND

Cheatham has been diagnosed with two mental disorders: schizoaffective disorder (bipolar type), and substance abuse disorder. The former is responsible for his commitment that is the subject of this case. In late 2011, Cheatham escaped from criminal custody and resisted/delayed/obstructed an officer after hearing nonexistent voices that led him to believe the police planned to shoot him. The next day, after returning to custody, he again attempted to escape and resisted/delayed/obstructed an officer after again hearing nonexistent voices that led him to believe his life was in danger. A trial court committed Cheatham to a state hospital after finding him not guilty of the resulting charges by reason of insanity.

In 2015, Cheatham was released from the hospital's custody and placed on supervised release. But for reasons that are unclear from the record, Cheatham "had a

3

number of rule violations" and, in 2019, he was again committed to a state hospital until 2021. According to Cheatham, although he "got in trouble for" a "few things" while on supervised release, he was not returned to hospital custody for that reason; he instead returned to hospital custody because he "needed a med[ication] change." On his return, he began taking a new medication to stabilize his mental health symptoms and, for the most part, the medication proved successful . Although it did not stop his symptoms altogether, including hearing nonexistent voices, it left him better able to cope with his symptoms.

In 2021, shortly before Cheatham's anticipated release from hospital custody, the Shasta County District Attorney filed a petition to extend Cheatham's commitment at the state hospital for another year. At a jury trial on the petition, the district attorney presented the testimony of two psychologists and a hospital counselor to support the extended commitment. The counselor testified that Cheatham initially engaged in "bizarre" behavior when he returned to hospital custody in 2019. He stated that Cheatham at times stood up during group meetings for no apparent reason, asked other committees for money, and, for a brief period, smoked cigarettes through his nose. The counselor believed at least some of this conduct was potentially attributable to Cheatham hearing nonexistent voices, adding that Cheatham at times violated hospital rules, including when he asked others for money, when he submitted a late urine sample, and when he occasionally refused to wear a face mask. The counselor noted, however, that Cheatham had not engaged in any such behavior in the year preceding trial and had "never threatened anyone."

The two psychologists testified next. The first testified that Cheatham returned to hospital custody, after a period in supervised release, following "a number of rule violations" indicating that Cheatham "was having difficulty controlling his behavior." Without specifying the substance of these violations, the psychologist said his "team" hoped "that perhaps trying a medication adjustment in a secure, controlled setting may

4

help him and may reduce these types of rule violations." The psychologist added that his team's hopes were largely realized when Cheatham's medication adjustment proved to be "very helpful." But even so, the psychologist believed Cheatham was not yet ready to be released as he still had "symptoms related to his diagnosis of schizoaffective disorder" and "needs supervision particularly in the area of medication management." He also expressed concern that Cheatham could self-medicate if released, particularly in light of Cheatham's addictive behaviors and past illicit drug use. He explained that if Cheatham resorted to illicit drugs, it would likely increase his mental health symptoms, decrease his control, and decrease his compliance with taking medications. The psychologist had neither seen Cheatham hurt anyone nor heard him threaten anyone, but he "agreed that [Cheatham] remained a . . . substantial physical danger to others as a result of his mental disease." That was because Cheatham "ha[d] serious difficulty controlling his behavior" and "c[ould]n't be trusted to continue to take his medication if he's totally unsupervised."

The second psychologist also expressed concern that Cheatham would self-medicate if released, particularly because of his caffeine and nicotine dependency, which she believed evidenced his addictive behavior, and his past use of alcohol and illicit drugs. She believed that if Cheatham "indulge[d] in that dependency more, [that] could lead to him becoming med[ication] non-compliant, which would lead to him becoming psychiatrically unstable." Should Cheatham "stop[] taking his medications and start[] using drugs and alcohol," she "believe[d] he would become more dangerous" as he could become delusional and think others meant him harm. She ultimately concluded that Cheatham "shouldn't be released tomorrow without supervision because he poses a substantial danger of physical harm to others as a result of his mental condition, because he has serious difficulty controlling his dangerous behavior."

Cheatham testified and acknowledged that he suffers from substance abuse disorder but asserted that he participates in Alcoholics Anonymous and Narcotics Anonymous and would not relapse. He acknowledged that he suffers from

5

schizoaffective disorder (bipolar type), and that he continues to have symptoms because of this disorder, including auditory hallucinations. He testified these nonexistent voices do not tell him to hurt people and that, with medication and coping techniques, he has been better able to ignore them. He asserted that he would take his medications following his release. Although one of the psychologists had testified that Cheatham expressed his belief that his main medication, Clorazil, did not help, Cheatham said she had misunderstood him; instead, he believed the medication worked but "wished it was working better so the voices were completely gone."

After hearing the parties' evidence, the jury found that Cheatham represented a substantial danger of physical harm to others because of his mental disease, defect, or disorder. The court extended Cheatham's involuntary commitment for two additional years, which doubled the one-year commitment sought by the district attorney.

Cheatham timely appealed. (See § 1237, subd. (a) [an appeal may be taken from "the commitment of a defendant for insanity"].) After multiple continuances sought and obtained by appellate counsel for Cheatham, the case was fully briefed on May 4, 2022, and assigned to this panel shortly thereafter. The panel requested oral argument and the cause was heard on August 22, 2022.

## DISCUSSION

### I

*Substantial Evidence of Danger of Physical Harm to Others and Serious Difficulty Controlling Potentially Dangerous Behavior*

Under section 1026.5, a person found not guilty of a felony by reason of insanity may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offenses. (§ 1026.5, subd. (a)(1).) This commitment may be extended in up to two-year increments if, because of a mental disorder, the person both "represents a substantial danger of physical harm to others" (*id.*, subd. (b)(1), (8)) and has "serious difficulty controlling his [or her] potentially dangerous behavior." (*People v.*

6

*Zapisek* (2007) 147 Cal.App.4th 1151, 1165 (*Zapisek*) [explaining due process requires this "serious difficulty" requirement]; see also *In re Lemanuel C.* (2007) 41 Cal.4th 33, 40-41 [before extending a civil commitment for a dangerous youth, due process requires a finding "that a mental deficiency, disorder, or abnormality causes serious difficulty in controlling the person's dangerous behavior"; "the constitutional principles set forth in those cases [developing this requirement] apply to all civil commitment schemes"].) Absent a waiver of the right to trial by jury, a person's commitment under this statute may not be extended unless a jury finds the necessary facts true beyond a reasonable doubt. (§ 1026.5, subd. (b)(4) ["The trial shall be by jury unless waived by both the person and the prosecuting attorney"]; *id.*, subd. (b)(7) ["The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings"]; *People v. Redus* (2020) 54 Cal.App.5th 998, 1011 (*Redus*) [jury must make necessary findings beyond a reasonable doubt in proceedings under § 1026.5].)

In this case, we consider whether any reasonable trier of fact could find, beyond a reasonable doubt, that Cheatham has serious difficulty controlling dangerous behavior because of his mental disorder. All parties agree Cheatham has a mental disorder. All parties also agree he struggled managing his symptoms before his current medication regime. And although the parties disagree whether Cheatham would continue with his medications if he were released, we accept, for purposes of this discussion, that a substantial risk exists that he would not. We likewise accept that, should he fail to take his medications, his mental health symptoms would likely increase.

As we have discussed, two psychologists testified on this topic, both explaining that Cheatham's mental stability depended in large part on a medication called Clozaril. According to one psychologist, Cheatham expressed his belief that Clozaril does not help him, which tends to suggest that, if released and left to his own devices, Cheatham would cease taking the medication. According to both psychologists, Cheatham could return to substance abuse if released, which would further erode any compliance with his

7

medication protocol. The psychologists based their belief on Cheatham's substance abuse disorder, his past substance abuse, and his current dependency on caffeine products and cigarettes while committed, which the psychologist believed evidenced his addictive behavior. Should Cheatham stop taking his medications, the psychologists believed his mental health symptoms would likely increase, particularly if he then resorted to alcohol or illicit drugs.

Accepting that this evidence is enough to show that a substantial risk exists that if Cheatham were released from commitment his compliance with his treatment plan would decrease and his mental health symptoms would increase, the question remains as to whether the evidence suffices to show that, because of these increased symptoms, Cheatham would have serious difficulty controlling his dangerous behavior.

As we have set forth *ante*, one of the psychologists testified that Cheatham would pose such a risk. She appeared to reason that his mental health disorder, when coupled with drug or alcohol use, could cause him to have delusions that would make him a danger to others. As an example, before beginning treatment, Cheatham once heard auditory hallucinations telling him he would be shot. Should he hear similar hallucinations again, the psychologist believed he could become dangerous to others. The other psychologist appeared to find likewise, though he stated only that Cheatham "has serious difficulty controlling his behaviors" generally, not that he had serious difficulty controlling his *dangerous* behavior. Indeed, as we have discussed, there was no evidence of dangerous behavior.

Although we accept that *some* individuals with Cheatham's mental disorder could have serious difficulty controlling their dangerous behavior in the event that they discontinued their medication and their hallucinations that they were at risk of harm resumed, there was no evidence that tied such a conclusion to Cheatham. Our focus is not on some hypothetical person who shares Cheatham's mental disorder, but on Cheatham himself. Focusing on Cheatham and the record before us, Cheatham has never

8

engaged in behavior dangerous to others because of his mental disorder. Nor has he given any indication that he would subject others to potential physical harm. Even when he had "pretty bad" mental health symptoms during supervised release, the record includes no reference to his engaging in behavior that exposed others to danger. In 2011, when he heard voices telling him he would be shot, his response was to flee rather than to lash out. In the decade since his initial commitment, and prior to that, the record includes not one instance in which Cheatham evidenced any propensity to engage in dangerous or threatening behavior toward others because of his mental disorder. The psychologists both acknowledged that they never observed Cheatham hurt or threaten anyone; further, the psychologist who reviewed periodic reports on Cheatham also acknowledged that he had never seen a report of Cheatham acting violently.

We do not disagree with the Attorney General that "[a] single psychiatric opinion that an individual is dangerous because of a mental disorder [can] constitute[] substantial evidence. . . ." (*Zapisek, supra*, 147 Cal.App.4th at p. 1165.) But that does not mean an *unsupported* psychiatric opinion will suffice. After all, "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." ' " (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 (*Anthony C.*).) The psychiatric opinion here was not based on relevant facts that were probative as to Cheatham's risk. Although we acknowledge the evidence showed that Cheatham could have difficulty controlling minor behaviors when unmedicated, as appeared to be the case when he stood up for no apparent reason during group meetings at the hospital, no reasonable juror could, on this record, make the leap to conclude that he also would have serious difficulty controlling *dangerous* behavior. No rational juror could find beyond a reasonable doubt that Cheatham's mental disorder would cause him to have serious difficulty controlling his dangerous behavior based on the evidence presented here.

9

Our conclusion accords with the Court of Appeal's recent decision in *Redus, supra*, 54 Cal.App.5th 998. The appellant in that case was initially committed in 1975 after being found not guilty of a murder by reason of insanity. (*Id.* at p. 1001.) The appellant committed the murder because he believed the victim, his common law wife, "was going to harm him." (*Id.* at pp. 1001-1002.) Over 40 years later, when the appellant was poised to be released, the district attorney sought to extend his commitment. (*Id.* at p. 1001.) The district attorney presented evidence showing the appellant "suffer[ed] from schizoaffective disorder, bipolar type, which [wa]s not in remission"; his symptoms "included psychosis, delusional thought content involving fixed false beliefs about various topics, and disorganized speech"; he "did not really believe that he ha[d] a mental disorder"; his prior supervised release resulted in revocation "on three or four occasions"; and he had "homicidal thoughts" while on supervised release. (*Id.* at pp. 1002-1003, 1005, 1012.) The district attorney also presented the testimony of a psychologist and psychiatrist, both of whom believed the appellant continued to pose a substantial danger of physical harm to others in large part based on his continuing delusions and lack of insight about the murder. (*Id.* at pp. 1002, 1005.)

After the appellant waived his right to a jury trial, the trial court found the district attorney made the necessary showing for continued commitment under section 1026.5. (*Redus, supra*, 54 Cal.App.5th at p. 1001.) But the Court of Appeal reversed for lack of substantial evidence. It acknowledged that a committed person's "lack of insight and continued delusions of the kind he or she suffered from at the time of the commitment offense can support a finding of continued dangerousness." (*Id.* at p. 1012.) But it found no "hint of violence, threatening behavior, or aggressiveness of any kind on the part of [the] appellant over multiple decades, even through [supervised] releases and medication lapses. Rather, the evidence showed that [the] appellant ha[d] controlled his dangerous behavior for decades, despite his ongoing delusions and paranoia." (*Ibid.*) For these

10

reasons, the court "conclude[d] the evidence presented at trial simply d[id] not provide the required link between appellant's ongoing mental illness and his purported difficulty in controlling his potentially dangerous behavior." (*Id.* at p. 1013.)

We find similarly here. In many respects, this case is even stronger for Cheatham. Unlike the appellant in *Redus*, who committed murder, Cheatham has not committed a violent crime of any sort. Unlike the appellant in *Redus*, he did not express doubts that he had a mental disorder and did not experience homicidal thoughts. And unlike the appellant in *Redus*, he was not actively delusional at the time of the proceedings for a commitment extension. At the time of trial in this case, Cheatham had no history of violence at all and fewer mental health symptoms than the appellant in *Redus*. Those considerations reinforce our conclusion that "substantial evidence simply does not support the [jury's] finding that [Cheatham's] mental illness causes, 'at the very least, serious difficulty controlling his potentially dangerous behaviors.' " (*Redus, supra*, 54 Cal.App.5th at p. 1013.)

Although the Attorney General argues *Redus* is distinguishable for three reasons, none of his arguments persuade. He first points out that Cheatham was committed in 2019, less than two years before the trial here, while the appellant in *Redus* had been committed for decades and "had no history of violence during his long hospital commitment." But Cheatham was first committed to a state hospital in 2012, not in 2019; although he was committed to the Sylmar facility in 2019, he was initially committed to another state hospital in 2012. Further, although Cheatham's overall time of commitment was far shorter than that in *Redus*, his criminal history was far less severe. The Attorney General next argues *Redus* is distinguishable because, unlike with Cheatham, a psychologist testified on behalf of the appellant in *Redus*. Although this is true, evidence is evidence, and the Court of Appeal did not rely on the psychologist's testimony in its analysis in *Redus*. It noted only briefly the psychologist's description of the appellant as "a 'fragile old man' " with limited physical capabilities. (*Redus, supra*,

11

54 Cal.App.5th at p. 1011.)  But that testimony had no apparent connection to the psychologist's area of expertise and, in any event, had little (if any) bearing on the court's holding that insufficient evidence "provide[d] the required link between [the] appellant's ongoing mental illness and his purported difficulty in controlling his potentially dangerous behavior." (*Id.* at p. 1013.)

The Attorney General's final argument for distinguishing *Redus* fails for similar reasons.  He notes that, unlike with Cheatham, the adult daughter of the appellant in *Redus* testified that she could help him after his release.  But although that is true (*Redus, supra*, 54 Cal.App.5th at p. 1006), the court neither relied on this detail nor even mentioned it in its reasoning for finding the evidence insufficient to support an extension of the appellant's commitment (see *id.* at p. 1013).  None of the distinguishing facts in *Redus* were significant to its holding, let alone dispositive.

The Attorney General argues that Cheatham "would have difficulty with the administration of Clozaril if he was not supervised."  That is in large part because those who take Clozaril require blood work to monitor liver function and because, according to one of the psychologists, Cheatham "would encounter difficulties with the blood testing if he was unsupervised."  But even supposing Cheatham would fall short in monitoring his liver function if released, that only tends to show that Cheatham's release could be detrimental to his own health, which is not a ground for extending a section 1026.5 commitment.  (See § 1026.5, subd. (b)(1) [a person's commitment may be extended if he or she, "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to *others*" (italics added)].)

The Attorney General next points to the psychologists' expressed concerns that Cheatham could relapse into drug and alcohol use if released unsupervised.  He argues that these concerns, together with Cheatham's admission that he was previously convicted for driving under the influence of alcohol, tend to show that he would "pose[] a substantial danger of physical harm to others" and would have "serious difficulty

12

controlling dangerous behavior" if released. But nothing in the record shows that Cheatham previously drove under the influence because of his mental disorder. Indeed, the record tends to reject this claim. The only evidence on this topic comes from Cheatham's testimony. The district attorney, focusing solely on Cheatham's schizoaffective disorder, asked whether he had symptoms from this disorder at the time he drove under the influence--an event that appears to have occurred over 13 years before the time of this trial. But Cheatham explained that he had not; those symptoms started some time afterward.

Although we accept that Cheatham *could* relapse into drug and alcohol use if released, which *could* then increase his mental health symptoms, we find this speculative outcome insufficient in itself to support continued commitment due to substantial risk of danger. The record reflects that Cheatham had experienced periods when he has used drugs and periods when his mental health symptoms were "pretty bad" and yet the record includes not one instance in which Cheatham evidenced any propensity to engage in dangerous or threatening behavior toward others because of his mental disorder. A person's potential for relapse and the consequences of such are, of course, meaningful considerations. But we cannot assume that people without a record of dangerous behavior will struggle to control dangerous behavior simply because they have, or are likely to have, active mental health symptoms--whether triggered by drug use, alcohol use, or something else. (See *Redus, supra*, 54 Cal.App.5th at pp. 1012-1013 [appellant's ongoing delusions and paranoia were not enough to support continued commitment].)

Lastly, appearing to acknowledge the absence of evidence of any actual or threatened physical harm to others, the Attorney General contends " '[p]roof of a recent overt act is not constitutionally required to extend the commitment of a person found to be criminally insane.' " (See *People v. Overly* (1985) 171 Cal.App.3d 203, 208 [stating the same].) That is true. But it is also true that substantial evidence is necessary to show a committee, because of a mental disorder, has "serious difficulty controlling his

13

potentially dangerous behavior." (*Zapisek, supra*, 147 Cal.App.4th at p. 1165; see also *People v. K.P.* (2018) 30 Cal.App.5th 331, 344 [stating the same].) And in this case, the district attorney failed to supply sufficient evidence to the jury to make this showing. The witnesses could point to no evidence showing Cheatham had *ever* committed a single violent, aggressive, or threatening act that was attributable to his mental disorder. A serious mental disorder in and of itself cannot justify an extension of Cheatham's commitment. To find otherwise would justify indefinite involuntary commitments for all those who have a serious mental disorder without regard to the actual risk of harm they pose to others because of their disorder. That approach is plainly inconsistent with the text of section 1026.5. We conclude the required evidence is lacking here.

## II

### *Double Jeopardy*

We turn next to Cheatham's contention that the district attorney should be barred from trying this matter again under double jeopardy principles.

The Fifth Amendment's double jeopardy clause states: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb. . . ." The California Constitution includes a similar clause. (Cal. Const., art. I, § 15 ["[p]ersons may not twice be put in jeopardy for the same offense"].) Both clauses prohibit anyone from being prosecuted or punished twice for the same crime--a prohibition that, among other things, forbids a second prosecution when the first prosecution resulted in a conviction that was ultimately set aside for insufficient evidence. (*United States v. Dixon* (1993) 509 U.S. 688, 696; *Burks v. United States* (1978) 437 U.S. 1, 18; see *People v. Monge* (1997) 16 Cal.4th 826, 844.) Neither clause, however, generally bars successive trials for a civil commitment. That is because the initiation of a proceeding that is civil in nature, including a civil commitment proceeding, "does not constitute a . . . prosecution." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 369; see also *id.* at p. 361 [courts ordinarily defer to a state's characterization of a proceeding as civil and "will reject the legislature's

14

manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil' "]; *Monge*, at p. 844 [with few exceptions, the state double jeopardy clause affords no greater protection than the federal counterpart].)

In this case, we consider whether double jeopardy protections prevent a second trial to extend a section 1026.5 commitment when the first trial resulted in an extension that is later reversed for insufficient evidence. Both parties agree, as do we, that the state and federal double jeopardy clauses do not apply in these proceedings of their own force. (See *Kansas v. Hendricks, supra*, 521 U.S. at p. 369 [the initiation of a civil "commitment proceeding does not constitute a . . . prosecution" under the federal double jeopardy clause]; see also *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 819, fn. 2 (*Hudec*) [noting, without expressing disagreement, that "Courts of Appeal have held commitment extension trials under section 1026.5 to be essentially civil in nature, rather than criminal"].) But they dispute whether, under the terms of section 1026.5, subdivision (b)(7), these clauses have nonetheless been incorporated into proceedings to extend a section 1026.5 commitment. That provision, as relevant here, states: In a proceeding to extend a person's commitment, "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (*Hudec*, at p. 819, fn. 2.)

In evaluating this question, we start with the one published decision that considered this topic: *People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477. There too the appellant contended section 1026.5, subdivision (b)(7) incorporated double jeopardy protections into proceedings to extend a section 1026.5 commitment. (*Williams,* at p. 487.) But the court rejected the argument, appearing to rely on two distinct reasons. It first found "[t]he statutory language merely codifies the application of constitutional protections to extension hearings mandated by judicial decision," and no judicial decision had ever found that double jeopardy principles apply in section 1026.5 proceedings.

15

(*Williams* at p. 488; see also *id.* at pp. 486-487.) It then found section 1026.5 "does not extend the protection of constitutional provisions," like the double jeopardy provisions, "which bear no relevant relationship to the proceedings." (*Williams* at p. 488.) It reasoned that "double jeopardy provisions can have no meaningful application to extension proceedings which are civil in nature, are for the purpose of treatment not punishment, and are not an adjudication of a criminal act or offense." (*Ibid.*)

Decades after *Williams*, in *Hudec, supra*, 60 Cal.4th 815, our Supreme Court rejected part of the *Williams* court's reasoning. The court there considered whether section 1026.5, subdivision (b)(7) incorporated the constitutional right not to testify into section 1026.5 proceedings. (*Hudec,* at pp. 819-820.) In evaluating this question, the court noted at the outset that "interpreting section 1026.5(b)(7) poses a degree of inherent difficulty. By its terms, the statute in effect commands a translation or transposition of procedural rights from the criminal context to the noncriminal, contexts sufficiently different to raise a question of its interpretation. That the appellate courts have struggled to delineate the set of criminal trial rights the statute incorporates into a commitment extension hearing is not surprising." (*Id.* at p. 826.) After noting this "inherent difficulty" in interpreting the statute, the court then appeared to proceed on the presumption that section 1026.5, subdivision (b)(7) incorporated all rights constitutionally guaranteed in criminal proceedings absent a "sufficient ground to depart from the statutory language." (*Hudec*, at p. 832; see also *id.* at p. 826 ["[o]n its face, the language of section 1026.5(b)(7) provides respondents in commitment extension hearings the rights constitutionally enjoyed by criminal defendants"; this language "serves to specify a set of rights—those constitutionally guaranteed in criminal proceedings—but it does not imply or suggest any further limitation within that designated set"].) And because, with regard to the right not to testify, the court found no persuasive ground for departing from the statutory language, it concluded that committees possess this right in proceedings to extend a section 1026.5 commitment. (*Hudec*, at p. 832.)

16

In the course of reaching this conclusion, our high court discussed at length both strands of the *Williams* court's reasoning. It first rejected "the *Williams* court's assertion that section 1026.5(b)(7) 'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.' " (*Hudec, supra*, 60 Cal.4th at p. 827.) It explained that this "construction of section 1026.5(b)(7)" is "unsupported by" case law and "also contrary to the legislative intent evident in the statutory language." (*Id.* at p. 828.) To the latter point, the court wrote that "the Legislature chose not merely to codify the particular rights mandated" in prior cases "but rather to state a broader rule that . . . commitments call for procedural protections otherwise applicable in criminal cases." (*Ibid.*)

The court turned next to the *Williams* court's finding "that constitutional rights bearing no 'relevant relationship' to commitment extension proceedings are not included in the granting language of section 1026.5(b)(7)." (*Hudec, supra*, 60 Cal.4th at p. 829.) The court wrote: "What the *Williams* court exactly meant by 'relevant relationship' is not clear, but the court appeared to use the phrase synonymously with 'meaningful application.' [Citation.] *Williams* reasoned that because section 1026.5 extension proceedings 'are not an adjudication of a criminal act or offense,' the first commitment extension hearing in *Williams* never placed the respondent in jeopardy of penal liability; double jeopardy protections therefore had no 'meaningful application' to such proceedings." (*Ibid.*) But, the court went on, "[w]hether or not this reasoning justified the result in *Williams,* a question we do not face here, the same logic does not serve in this case. The right not to testify in a proceeding where one is a defendant is a right that *could* meaningfully apply in any type of adversarial proceeding, though only in criminal cases is it constitutionally guaranteed." (*Id.* at p. 830.)

With these cases in mind, we turn to the question the *Hudec* court declined to address--whether the second strand of the *Williams* court's reasoning justifies its conclusion. We conclude it does not. We accept that constitutional rights that have no

17

"meaningful application" to commitment extension proceedings are not included in the granting language of section 1026.5, subdivision (b)(7). But we reject the *Williams* court's ultimate conclusion that double jeopardy protections could have no meaningful application in this context. The right not to be tried twice on the same matter, to use the *Hudec* court's language, is surely a right "that *could* meaningfully apply in any type of adversarial proceeding, though only in criminal cases is it constitutionally guaranteed." (*Hudec, supra*, 60 Cal.4th at p. 830.) Applying this type of protection in section 1026.5 extension proceedings would, of course, depart from the normal application of the state and federal double jeopardy clauses, which, by their terms, are concerned only with criminal offenses. But the very purpose of section 1026.5, subdivision (b)(7) was to extend to these proceedings those rights ordinarily applicable in criminal proceedings, and so this departure from the normal application of these clauses is hardly noteworthy. (See *Hudec,* at p. 827 ["the Legislature could not have meant to *exclude* all rights whose application is constitutionally mandated in the criminal justice system; the result would render the statutory provision a nullity"].)

Because we find *Williams* unpersuasive for these reasons, and because we find no "other sufficient ground to depart from the statutory language" granting those under NGI commitment "the rights constitutionally guaranteed to criminal defendants," we conclude that a district attorney cannot pursue a second trial to extend a person's section 1026.5 commitment when the first trial resulted in an extension that is later reversed for insufficient evidence. (*Hudec, supra*, 60 Cal.4th at p. 832 ["By its terms, section 1026.5(b)(7) provides that [§ 1026.5] committees facing a commitment extension hearing enjoy the trial rights constitutionally guaranteed to criminal defendants"]; cf. *Burks v. United States, supra*, 437 U.S. at p. 11 ["The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding"].)

18

Our conclusion largely aligns with our earlier decision in *Anthony C., supra*, 138 Cal.App.4th 1493. There we considered a nearly identical statute that "allows for a two-year extension of a [youth] commitment if a jury finds that upon discharge, the ward 'would be physically dangerous to the public because of [the ward's] mental or physical deficiency, disorder, or abnormality.' " (*Id.* at p. 1499.) Per the terms of that statute, similar to the statute before us, "the person being tried for extended commitment 'shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings.' " (*Id.* at p. 1509.) Considering this language, which we labeled as "clear and unambiguous," we found "this 'all rights' language includes the prohibition against double jeopardy." (*Id.* at p. 1510.) We also found another provision, which allows a reviewing court to " 'affirm the order of the lower court, or modify it, or reverse it and order the appellant to be discharged,' " reinforced this reading. (*Id.* at pp. 1509, 1511.) We reasoned that the discretion afforded in this provision "is consistent with double jeopardy, which does not bar retrial upon reversal of a conviction for trial error [citations], but does bar retrial when a conviction is reversed for evidentiary insufficiency." (*Id.* at p. 1511, fn. omitted.)[2]

---

[2] One justice dissented from this conclusion. He wrote: "I read the disputed statutory language as follows: 'The person shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings that have been mandated by *People v. Superior Court* (*Vernal D.*)[(1983)] 142 Cal.App.3d 29.' " (*Anthony C., supra*, 138 Cal.App.4th at p. 1521 (dis. opn. of Sims, J.).) He grounded his reasoning in the legislative history for the statute at issue there, which, among other things, stated: " 'The purpose of the bill is to codify judicially mandated due process safeguards in the statute to insure that extension proceedings are conducted properly.' " (*Id.* at p. 1520 (dis. opn. of Sims, J.).) But no similar statement appears in the legislative history for section 1026.5. And in construing section 1026.5 and its distinct legislative history, the *Hudec* court explicitly found that "the Legislature chose not merely to codify the particular rights mandated" in prior cases "but rather to state a broader rule that . . . commitments call for procedural protections otherwise applicable in criminal cases." (*Hudec, supra*, 60 Cal.4th at p. 828.)

Considering section 1026.5's similarly "clear and unambiguous" language, we find similar reasoning prevails here.  On its face, section 1026.5 grants respondents in commitment extension proceedings "the rights guaranteed under the federal and State Constitutions for criminal proceedings," and one of the constitutional rights guaranteed in criminal proceedings is the right not to be subject to "repeated prosecutions for the same offense."  (*United States v. Dinitz* (1976) 424 U.S. 600, 606 [one of the rights guaranteed "in a criminal proceeding" is the right not to be subject to "multiple punishments or repeated prosecutions for the same offense"].)  That said, we acknowledge section 1026.5 is distinct in some respects from the statute at issue in *Anthony C.*  First, unlike the statutory scheme in *Anthony C.*, the one here does not include a provision expressly allowing a reviewing court to reverse the trial court's order and order the appellant to be discharged.  Second, while section 1026.5 provides that a person facing extension of an insanity commitment "shall be entitled to *the rights* guaranteed under the federal and State Constitutions for criminal proceedings" (italics added), the statute in *Anthony C.* guarantees "*all* rights guaranteed under the federal and state constitutions in criminal proceedings."  (Welf. & Inst. Code, § 1801.5, italics added.)  The *Anthony C.* court found both these distinctions--particularly the "rights" language--important in its effort to distinguish *Williams*.  (*Anthony C., supra*, 138 Cal.App.4th at pp. 1512-1514.)

We find neither distinction particularly meaningful for our purposes.  Starting with the "all rights" and "the rights" language, our Supreme Court in *Hudec* already found this very type of distinction meaningless in discussing these two statutes.  It explained that "[i]n this context, 'the' can be read as equivalent to 'all.' " (*Hudec, supra*, 60 Cal.4th at p. 826.)  After all, "the rights" guaranteed under the state and federal constitutions are not a subset of the rights guaranteed under these documents; they are instead *all* these rights.  Turning next to the absence of a provision expressly authorizing a reviewing court to reverse the trial court's order and order the appellant to be discharged, we find this distinction too to be largely meaningless.  Although the statutory scheme governing

20

section 1026.5 commitments does not specifically include this authority, general statutory authority nonetheless authorizes an appellate court to review an order committing a defendant for insanity (§ 1237) and, as appropriate, to reverse and modify these types of orders (§ 1260). In the end, although we acknowledge the statute in *Anthony C.* and the one here are not precisely identical, we decline to find that these minor distinctions demonstrate that the former provision incorporates double jeopardy protections while the latter nearly identical provision does not.

Nor do we find any other language in section 1026.5 favoring a different reading. Attempting to make this showing at oral argument, the Attorney General's representative asserted that consideration of section 1026.5, subdivision (b) as a whole favors his preferred interpretation. He reasoned as follows: Because other provisions in subdivision (b) grant committees specific trial rights--including "the right to be represented by an attorney and . . . the right to a jury trial" (§ 1026.5, subd. (b)(3))--we should construe subdivision (b)(7) to cover only other "trial rights," that is, only other "rights that pertain to the evidentiary phase of trial." In making this argument, the Attorney General appears to invoke the canon of statutory construction that " 'a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would . . . make the item markedly dissimilar to the other items in the list.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307.)

But the rights afforded to those committed under section 1026.5 subdivision (b) are not, as the Attorney General argues, concerned only with "the evidentiary phase of trial." Some are, to be sure, including the right to an attorney. (§ 1026.5, subd. (b)(3).) But others are not, including the right to be tried in a timely manner. (*Id.*, subd. (b)(4) ["The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless that time is waived by the person or unless good cause is shown"].) The Attorney General's argument, then, that section 1026.5, subdivision (b)(7) only serves as a catchall for unenumerated "rights that pertain to the

evidentiary phase of trial" is unpersuasive. " 'Here, the Legislature bestowed upon potential committees "*the* rights guaranteed under the federal and State Constitutions for *criminal proceedings*," not '*some* of the rights' " and not solely rights pertaining to the evidentiary phase of a criminal proceeding. (*Hudec*, *supra*, 60 Cal.4th at p. 826.) Finding no persuasive reason for narrowing the Legislature's chosen language, we conclude defendant may not be retried on this petition.

## DISPOSITION

The order extending Cheatham's commitment is reversed. The trial court is directed to dismiss the petition to extend Cheatham's commitment.


_____/s/_____
Duarte, J.



We concur:



_____/s/_____
Robie, Acting P. J.



_____/s/_____
Krause, J.